UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

CHARLES MCLANE,                    )
                                   )
        Plaintiff,                 )
                                   )
    v.                             )    CIVIL NO.  3:15CV119
                                   )
SCHOOL CITY OF MISHAWAKA,          )
                                   )
        Defendant.                 )

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant,

School City of Mishawaka ("School City") on October 1, 2016.   The plaintiff, Charles McLane

("McLane"), responded to the motion on November 16, 2016, to which School City replied on

November 30, 2016.  McLane then filed a sur-response on December 19, 2016, to which School

City filed a sur-reply on December 27, 2016.

For the following reasons, the motion will be granted.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Not every dispute between the parties precludes summary judgment, however, since "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law" warrant a

trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all

facts in the light most favorable to the non-moving party and draw all reasonable inferences in

that party's favor. <u>Heft v. Moore</u>, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly

supported summary judgment motion may not rely merely on allegations or denials in its own

pleading, but rather must "marshal and present the court with the evidence she contends will

prove her case." <u>Goodman v. Nat'l Sec. Agency, Inc.</u>, 621 F.3d 651, 654 (7th Cir. 2010).

<u>Discussion</u>

McLane has sued his former employer, School City, alleging violations of the Americans

with Disabilities Act, the Rehabilitation Act, and the Age Discrimination in Employment Act.

McLane began working with School City as an independent contractor in August of 2007.

(Deposition of Charles P. McLane at 18:19-22, 19:15, the "McLane Dep."). McLane became a

regular full time employee with School City in February of 2008. (McLane Dep. 19:15-19).

McLane initially worked as a heavy equipment operator and then transitioned into a position as a

groundskeeper. (Deposition of Gregg Hixenbaugh at 17:5-18, the "Hixenbaugh Dep."). Based on

the results of a job site analysis, McLane was transferred from the position of groundskeeper to

hall monitor. (Hixenbaugh Dep. 32:6-17, 33:16-24, 72:11-17;  McLane Deposition Exhibit 8,

August 5, 2014 Correspondence to McLane; McLane Deposition Exhibit 9, August 22, 2014

Correspondence to McLane). McLane failed to report for duty for the hall monitor position.

(McLane Dep. 69:3-4). As a result, McLane was terminated from his employment with School

City on September 9, 2014. (McLane Deposition Exhibit 10, September 10, 2014

Correspondence to McLane).

McLane worked primarily as a groundskeeper at Baker Park in the summer and worked

on snow removal in the winter. (Deposition of Charles Trippel at 13:25-14:1-4, 16:11-17, the

"Trippel Dep."). Baker Park is an athletic facility which consists of two baseball diamonds, two

2

softball diamonds, a soccer field, and tennis courts and related facilities such as restrooms and a press box. (Trippel Dep. 9:2-13; McLane Dep. 32:5-11). According to McLane and his supervisor, Charles Trippel, McLane was required to perform various tasks at Baker Park including maintaining the baseball and softball diamonds, mowing the grass, edging, preparing for ballgames, and maintaining the facilities by cleaning the bathrooms, taking out the trash, and general clean up. (Trippel Dep. 14:5-6, 19:24-20:3; McLane Dep. 32:14-20).

School City's job description (the "Job Description") for the groundskeeper position also sets forth various qualifications and functions of the job. (Trippel Deposition Exhibit 3, Job Description attached to April 29, 2014 Email). The Job Description was in place while McLane was employed at School City. (Trippel Dep. 63:15-19). The description required groundskeepers to be able to "bend, stoop, climb a ladder, stand for extended time periods and lift up to one hundred (100) pounds." (Trippel Dep. Exhibit 3—Qualifications Section). During his deposition, McLane agreed that the position required him to stand for extended periods of time. (McLane Dep. 29:16-20). McLane also agreed that bending was also a requirement of the job. (McLane Dep. 29:21-30:2).

McLane's job duties and essential functions are also described in the Process Description and Work Activity Assessment of the job site analysis (the "Job Site Analysis") performed by physical therapist, Ronald D. Knickrehm. (Defendant's Exhibit 5 to Deposition of Ronald D. Knickrehm, Job Site Analysis). Knickrehm obtained the information for the essential functions of the groundskeeper position through his discussions with McLane, his observations of McLane, and by looking at the duties performed by McLane. (Deposition of Ronald Knickrehm at 24:10-25, the "Knickrehm Dep."). Knickrehm identified various essential functions for the

groundskeeper position including step ladder climbing, cleaning bleachers, and gathering trash. (Knickrehm Dep. 43:10-44:5). Knickrehm also noted that bending, squatting, stooping, stair climbing, standing, and walking were essential functions and activities. (Knickrehm Dep. 16:14-25, 35:9-17, 44:14-23; Exhibit H, pg. 3, Activity Findings Section).

Charles Trippel ("Trippel") was McLane's supervisor. (Trippel Dep. 15:12-14; Hixenbaugh Dep. 11:21-24). As McLane's supervisor, Trippel would check on McLane while McLane was out in the field working. (Trippel Dep. 15:15-21). Trippel would observe McLane working on average about three to four times a week for about fifteen minutes to a half an hour. (Trippel Dep. 23:19-22, 54:2-7).

During Trippel's observations, Trippel noticed that at times McLane was doing his job but that other times it appeared that McLane was struggling in the performance of his work, having difficulty bending over and picking items up. (Trippel Dep. 24:1-7). Trippel also observed that McLane was not able to walk consistently nor could he walk more than ten or fifteen feet. (Trippel Dep. 24:19-20, 64:17-23). Trippel became concerned with McLane's difficulty with walking, work, and performance of his duties. (Trippel Dep. 28:7-13, 29:15-19). He noted that McLane had difficulty with other tasks, such as cleaning bathrooms (due to the required bending) and cleaning bleachers, and generally noted that McLane looked like he was in pain when trying to go about normal activity. (Trippel Dep. 65:3-9, 66:17-21, 67:1-3).

In the spring of 2014, Trippel discussed his concerns with McLane. (Trippel Dep. 28:22-29:3). At that time, Trippel had concerns about McLane's ability to get his job done. (Trippel Dep. 29:15-19). Trippel also informed his boss, Randy Squadroni, of his concerns and expressed that he did not wish to see McLane get hurt. (Trippel Dep. 29:20-30:5). Trippel also made

Gregg Hixenbaugh ("Hixenbaugh"), School City's Executive Director for Human Resources and Legal Counsel, aware of his concerns regarding McLane. (Hixenbaugh Dep. 24:1-4, 7:13-15). During his conversation with Hixenbaugh, Trippel expressed his concern about McLane's ability to safely and fully perform his job functions. (Hixenbaugh Dep. 23:2-5, 25:13-16). Following the conversation, Hixenbaugh decided that School City would exercise its right to have McLane undergo a fit for duty exam. (Hixenbaugh Dep. 24:22-25, 42:7-11).

According to School City policy, a fit for duty exam is appropriate when a concern is raised regarding an employee's ability to perform his or her job related functions in a safe manner. (Hixenbaugh Dep. 15:15-16:2; Defendant's Exhibit 3 to Hixenbaugh Deposition, School City 4160 Physical Examination Policy; Defendant's Exhibit 4 to Hixenbaugh Deposition, School City 4160A Physical Examination Policy). Such exams were not conducted without Hixenbaugh's approval. (Hixenbaugh Dep. 16:6-9). It was Hixenbaugh's understanding that when such exams and related occupational reviews were conducted that the employee's abilities would be assessed with respect to all employment. (Hixenbaugh Dep. 49:20-50:3). As a result, McLane was requested to undergo a fit for duty exam. (Hixenbaugh Dep. 24:22-25, 42:7-11). Over the course of Hixenbaugh's tenure with School City, other maintenance and custodian employees were also asked to undergo fit for duty exams. (Hixenbaugh Dep. 16:13-16, 26:7-11, 71:25-72:4).

On May 2, 2014, McLane underwent a fit for duty exam which was performed by Dr. Troy Bergin ("Dr. Bergin") of IU Health Occupational Services/Wipperman Clinic (the "Fit for Duty Exam"). (McLane Dep. 53:6-54:1; Exhibit 6 to Deposition of McLane, Health Status Report). As a result of the exam, Dr. Bergin found McLane fit for duty but requested that a job

site functional capacity evaluation be performed. (McLane Dep. 54:7-20).

Ronald Knickrehm performed the Job Site Analysis requested by Dr. Bergin on May 11, 2014. The purpose of the Job Site Analysis was to see if McLane could do the essential functions of his Job. (Knickrehm Dep. 63:11-13). Knickrehm concluded that McLane was unable to "safely stoop, squat, kneel, crawl, climb ladders, and climb standard stairs…it is my professional opinion that these deficits will not improve with instruction or education and are physically limiting this employee's ability to safely perform the essential functions of his job." (Job Site Analysis pg 3, Recommendations Section).

Knickrehm holds a Bachelor of Science in Physical Therapy, is a licensed physical therapist, and holds a number of designations including Certified Ergonomic Assessment Specialist Level III, WorkWell Systems Functional Capacity Evaluation, maintains his current licensing requirements and also keeps apprised of professional journals and participates in online training. (Knickrehm Dep. 6:15-25, 7:15-8:25, 9:4-6, 10:15-25, 12:14-25). Knickrehm works primarily in industrial medicine including physical therapy as it relates to work injuries, job site analyses, essential function screenings, and office ergonomics. (Knickrehm Dep. 15:14-20). He estimates that he has performed four to five hundred job site analyses and performs approximately 30-50 per year. (Knickrehm Dep. 14:17-24, 15:21-23).

Knickrehm described the job site analysis process as a mixture of observation and information gathering, including obtaining information from the employee, job descriptions, and the employer. (Knickrehm Dep. 16:2-18:9, 20:21-25). Once the process is complete, Knickrehm reviews the gathered information and develops his opinions. (Knickrehm Dep. 18:6-9). This process is considered to be the normal methodology used for job site analysis and is the accepted

practice in the industry. (Knickrehm Dep. 18:10-22). Knickrehm used the same process when conducting the Job Site Analysis on McLane. (Knickrehm Dep. 20:13-15).

Through his observations, Knickrehm noted that McLane was unsteady, had difficulty walking, could not walk frequently, was unable to bend properly, and noted that McLane's knees didn't allow him to crawl or use safe body mechanics and at times did such functions while breathing heavily and perspiring, which Knickrehm explained as signs of exertion. (Knickrehm Dep. 21:14-23:10, 33:19-34:2). Knickrehm also noted that McLane's knees did not operate properly and that McLane could not squat. (Knickrehm Dep. 23:13-16; 28:22-29:10, 31:17-32:5). McLane would also not be able to climb a ladder as Knickrehm observed McLane struggling to climb a six inch step. (Knickrehm Dep. 32:12-17).

McLane admitted to Knickrehm that he could not keep his legs straight while lifting, which caused McLane to use unsafe body mechanics while lifting. (Knickrehm Dep. 28:10-20, 29:14-22). McLane also admitted to Knickrehm that he could not stoop, bend his knees, or get down in a crouch. (Knickrehm Dep. 55:18-56:6). McLane also admitted in his deposition that he worked in pain, that he had difficulty climbing steps, that his knees hurt, that it wasn't easy for him to bend because it caused him pain, and that he had lost some physical ability over time. (McLane Dep. 40:1, 42:12-17, 46:9-14).

Based on his observations, Knickrehm determined that performing the above functions would put McLane at risk for injury. (Job Site Analysis pg. 3, Recommendations Section). Specifically, Knickrehm noted that McLane's improper lifting mechanics put McLane at risk of back injury, including a ruptured disk, causing a risk of disability. (Knickrehm Dep. 29:15-30:22). Knickrehm stated that when conducting a functional capacity evaluation he does not

recommend that someone continue an activity that puts the individual at risk. Knickrehm opined that McLane exhibited a potential risk of back injury. (Knickrehm Dep. 34:10-35:8). Knickrehm also noted that McLane had a potential risk of falling in relation to climbing as well as walking on uneven surfaces. (Knickrehm Dep. 35:23-36:24, 34:5-13). Lifting with improper body mechanics also put McLane at risk of injury as Knickrehm explained that the more McLane lifted the more pressure would be exerted on the disks in McLane's back. (Knickrehm Dep. 38:6-39:14). Knickrehm concluded that McLane's physical inabilities put him at risk. (Knickrehm Dep. 42:4-23). Knickrehm further noted that McLane was possibly constantly at risk. (Knickrehm Dep. 42:25-43:7). In addition, Knickrehm also noted that McLane's physical deficits would not improve with education and instruction. (Job Site Analysis pg. 3 Recommendations Section). In the case of improper lifting mechanics, Knickrehm explained that he could instruct McLane how to lift properly but that, "knowing his [McLane's] knees have probably been that way for awhile, exercise is not gonna change the structure of your knee. So, if you have difficulty doing that and it's a –well, you're not just able to do that, then exercise would probably not help that a whole lot." (Knickrehm Dep. 41:11-24).

While performing his job duties, McLane was allowed to use equipment such as a golf cart and a tractor. (Trippel Dep. 25:7-13). Knickrehm took the use of such equipment into account when conducting the Job Site Analysis. (Knickrehm Dep. 64:16-23). Even with the use of equipment, Knickrehm concluded that McLane would still be at risk. (Knickrehm Dep. 56:17-60:19, 61:18-19). For example, Knickrehm explained that even if McLane used a cart or tractor to lift heavy bags, McLane would still be at risk of injury as he would still have to lift the bags even if he simply transferred them from the cart or tractor. (Knickrehm Dep. 69:8-20).

Knickrehm noted that McLane even had difficulty getting into the tractor he was using to help him do the lifting. (Knickrehm Dep. 68:23-69:7).

After School City's review of the Job Site Analysis, the decision was made that McLane could not continue in his position as a groundskeeper and would be transferred to a hall monitor position. (Hixenbaugh Dep. 27:20-28:1, 32:6-12, 33:16-24). The decision was made based on Knickrehm's opinion that McLane could not safely perform his job duties. (Hixenbaugh Dep. 27:20-28:1, 32:6-12). Hixenbaugh made the decision for the transfer. (Hixenbaugh Dep. 37:22-38:2). McLane was not offered a position as a custodian due to the Job Site Analysis and the fact that the opinions expressed therein were also relevant to the custodian position which had similar if not identical physical requirements. (Hixenbaugh Dep. 34:6-16, 36:13-17). Prior to starting his hall monitor position, McLane was placed on a leave of absence in accordance with School City Policy. (Hixenbaugh Dep. 46:14-20; Defendant's Exhibit 2 to Hixenbaugh Deposition, School City Policy 4161 Unrequested Leaves of Absence). Hixenbaugh made the decision to put McLane on the leave of absence. (Trippel Dep. 34:18-20).

McLane failed to report for the hall monitor position. (McLane Dep. 69:3-4). As a result, McLane was terminated from his employment with School City on September 9, 2014.

No one was hired to replace McLane in his position as groundskeeper. (Trippel Dep. 58:20-23). McLane's duties were completed by existing employees after the transfer. (Trippel Dep. 60:1-8).

In support of summary judgment, School City first argues that McLane has failed to support a claim under the Americans with Disabilities Act. McLane can attempt to prove his ADA claim under either the direct method of proof or the indirect method of proof. Under the

direct method, McLane must show that he has a disability within the meaning of the ADA, that he is qualified to perform the essential functions of his job, with or without reasonable accommodation, and that he was subject to an adverse employment action due to his disability. *Herrera v. Ill. Bell. Tel. Co.*, 2013 U.S. Dist. LEXIS 23406 (N.D. Ill. 2013). Under the indirect method, McLane must establish a prima facie case showing that "he is disabled under the ADA", "that he was meeting his employer's legitimate expectations," "that he suffered an adverse employment action," and "that similarly situated employees without a disability were treated more favorably." *Bunn v. Khoury Enters.*, 753 F.3d 676, 687 (7th Cir. 2014). School City contends that McLane cannot meet his burden under either method.

School City maintains that McLane was not qualified to perform the essential functions of his job. McLane has the burden of proof to show he is a "qualified individual." Under the ADA, a "qualified individual" is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(g). To make the determination, the court should consider the "employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* Federal regulations have provided instructions as to the categories of evidence a court should look to in determining the essential functions of a job. *Miller v. Ill. DOT*, 643 F.3d 190, 197 (7th Cir. 2011). Courts should look to:

> (I) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective

bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Id*. Employers are entitled to substantial deference in the determination of the essential functions of the positions of their employees. *Vranisoska v. Franciscan Cmty., Inc*., 2013 U.S. Dist. LEXIS 123423 (N.D. Ind. 2013) at 20. Courts should not interfere with the determination of these duties unless there is reason to believe that an employer has allocated duties for pretextual reasons. *Id.*

School City contends that McLane was not qualified to perform the position of a groundskeeper. According to both McLane and his supervisor, Charles Trippel, McLane's duties as a groundskeeper required him to maintain the athletic facilities at Baker Park, mow the grass, perform edging, take out trash, etc. The Job Description for the position required McLane to be able to "bend, stoop, climb a ladder, stand for extended time periods and lift up to one hundred (100) pounds." (Job Description—Qualifications Section). These job requirements were confirmed by Ron Knickrehm through his Job Site Analysis of McLane. Knickrehm's expert opinion found that essential functions for the position included climbing, bending, squatting, stooping, standing, and frequent walking.

School City argues that Knickrehm's conclusions in the Job Site Analysis prove, without a doubt, that McLane cannot perform the essential functions of his job. Knickrehm specifically found that McLane could not stoop, squat, kneel, or crawl and McLane, himself, admitted to Knickrehm that he could not stoop, bend his knees, or get down in a crouch. Further, Knickrehm found that McLane could not safely climb stairs, climb ladders, and was unable to use safe body mechanics when lifting, and was unable to perform activities that require kneeling. All of these limitations, according to Knickrehm's expert opinion, prevented McLane from safely performing

11

the essential functions of his job. Thus, School City argues that McLane is not a "qualified individual" under the ADA.

School City also asserts that McLane could not perform the functions of his job with accommodations. The plaintiff in an ADA case under the direct method of proof has the burden of establishing that he is qualified to perform the essential functions of a job with or without reasonable accommodation. A plaintiff must make a "'showing sufficient to establish the existence of [the] element essential' to his case—that is, that he can perform the essential functions of the job." *Branham v. Snow*, 392 F.3d 896, 905 (7th Cir. 2004). A plaintiff needs to show that either he is qualified to perform his job without accommodation, or that a reasonable accommodation could be made that would enable him to carry out the essential functions of the job. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292 (7th Cir. 2015).

McLane was allowed to use equipment to assist him with his job duties including the use of a golf cart and a tractor. As noted, Knickrehm took the use of the equipment into account when he conducted the Job Site Analysis. Even with the use of the equipment, Knickrehm concluded that McLane could not safely perform the essential functions of his job. In his deposition, Knickrehm explained that even if McLane used a tractor to lift heavy objects such as bags of dirt, McLane would still have to lift the bags manually from the tractor at some point to use them. Knickrehm found that McLane could not safely do so. In fact, Knickrehm even found that McLane had difficulty getting into both the tractor and the golf cart. Thus, School City contends that, even with reasonable accommodations, McLane could not perform the essential functions of his job.

School City is of the belief that McLane posed a direct threat to himself. Under the ADA,

an individual is per se not a qualified individual if he poses a "direct threat" to himself and/or others due to his disability. 29 C.F.R. § 1640.2(r). A "direct threat" under the ADA means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. *Id.* To determine whether or not an individual would pose a direct threat, a court should consider: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Darnell v.Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005).

School City argues that, as established by Knickrehm in the Job Site Analysis, McLane's physical imitations prevented him from safely performing the essential functions of his job and put McLane at risk of injury. As an example, McLane noted throughout the Job Site Analysis that McLane's physical issues cause him to use improper lifting mechanics. As a result, McLane was at significant risk of back injury including the possibility of a ruptured disk which, according to Knickrehm, could cause disability. Knickrehm also noted that McLane was at risk of falling if climbing a ladder or walking. School City contends that the possibility of harm to McLane was present while he was performing the essential functions of his job even with available accommodations.

McLane suggests in his response brief that to succeed on his Americans with Disabilities Act claim, he need only show that School City regarded him as disabled under 42 U.S.C. §12102. However, McLane must not only show that he has a disability, or was regarded as having a disability, under the ADA, but must also show that he was qualified to perform the essential functions of his job with or without reasonable accommodation and that he was subject to an

adverse employment action due to his disability. *Herrera v. Ill. Bell. Tel. Co.*, 2013 U.S. Dist. LEXIS 23406 (N.D. Ill. 2013) at 23; *see also, Quick v. City of Fort Wayne*, 2016 U.S. Dist. LEXIS 131868 (N.D. Ind. 2016) at 11 (stating that in order to recover under a regarded as claim, a plaintiff must also show that he or she was qualified to perform the essential functions of the position). As noted above, McLane has not presented evidence to support such a direct discrimination claim nor has he presented evidence to support any indirect claim for discrimination.

McLane attempts to claim that School City created the job description and essential functions for McLane's position in order to terminate him. McLane's claims are, however, unfounded. Trippel, McLane's supervisor, has testified that the job description was in place during McLane's employment with School City. (Trippel Dep. 63:15-19). Gregg Hixenbuagh, the former Director of Human Resources, could not specifically recall if he was involved with revising the job description but stated that he would imagine that the job description was in place prior to the April 28th, 2014 revision date. (Hixenbaugh Dep. 43:12-44:9). Although McLane claims in his Response that he had no knowledge of the job description existing prior to 2014, he actually testified in his deposition that he had no personal knowledge when it was created other than the job description stated that it was revised in April of 2014. (McLane Dep. 27:8-13).

It is undisputed that Knickrehm, through the Job Site Analysis, determined various essential functions of McLane's position and found that McLane either could not perform the functions at all or could not perform them safely. Accordingly, this court agrees with School City that McLane was not qualified to perform the essential functions of his job and, therefore, cannot succeed on his ADA claim.

Moreover, as discussed above, it is clear that McLane posed a direct threat to himself and others. McLane attempts to assert that he was not a direct threat because he had performed his job without filing a worker's compensation claim. However, just because an injury has not occurred yet does not mean that there was no risk of future injury. It would have been irresponsible of School City to sit idly by and hope that an injury did not occur, especially when the Job Site Analysis and Knickrehm suggested that an injury was likely to occur.

McLane also attempts to claim he was not a direct threat because he was allowed to use equipment in his job. Knickrehm was very clear in his deposition testimony that although McLane could use equipment he was still subject to risk of injury. (Knickrehm Dep. 56:17-60:9, 69:8-20). Clearly, McLane was a direct threat and therefore not qualified for the job.

As previously discussed, pursuant to the Job Site Analysis, McLane could not safely perform the essential functions of his job. Knickrehm stated in the Job Site Analysis that, "It is my professional opinion that these deficits will not improve with instruction or education and are physically limiting this employee's ability to safely perform the essential functions of his job." (Job Site Analysis at pg. 3, Recommendations Section). As a result, School City transferred McLane to a hall monitor position. McLane's inability to safely perform the essential functions of his job and related potential injury were legitimate, nondiscriminatory reasons to transfer McLane. School City could not simply ignore the findings of the Job Site Analysis and hope that McLane continued in his position without injury. In addition, the Job Site Analysis concluded that McLane's limitations could not be helped through instruction and education. (Job Site Analysis at pg. 3, Recommendations Section). After receiving the results of the Job Site Analysis, it would have simply been irresponsible for School City to allow McLane to continue

15

to work in the groundskeeper position.

McLane asserts that School City's reason is simply pretextual. However, McLane has not met his burden to prove pretext. To show pretext, a plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reason." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014); *Novak v. Bd. of Tr.*, 777 F.3d 966, 977 (7th Cir. 2015)(stating that to show a reason is pretextual, a plaintiff must show that the reason constitutes a mistruth—a lie on the part of the defendants…pretext means a phony reason for action); *Sheidler v. Ind.*, 2016 U.S. Dist. LEXIS 34460 at 24 (stating that "to demonstrate a material issue of fact as to pretext, [a plaintiff] must show that 'either 1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or 2) that an employer's explanation is not credible,'…to meet this burden, [Scheidler] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the State's] asserted reason 'that a reasonable person could find it unworthy of credence.'"

In the present case, McLane has offered no evidence to show that School City's reason for McLane's transfer is "phony." Further, McLane has provided no evidence, whether by expert or otherwise, that contradicts Knickrehm's findings that McLane could not safely perform the essential functions of his job. Moreover, the Job Site Analysis was not ordered by School City but, rather, by the physician that performed the Fit For Duty Exam. The Job Site Analysis was an independent review of McLane's abilities. Because School City's decision to transfer McLane was based on the conclusions of the Job Site Analysis, and McLane has not submitted any

evidence to refute the conclusions of the Job Site Analysis, this court finds that School City has shown that it transferred McLane for a legitimate, nondiscriminatory reason and McLane's claims for discrimination fail on all counts.

School City next contends that McLane has failed to support a claim under the Rehabilitation Act. For a plaintiff to succeed on a claim under the Rehabilitation Act, he must prove that he is disabled within the meaning of the statute, that he was otherwise qualified for the job in question, that he was the subject of an adverse employment action because of his disability, and that the "employment program of which [his] job was a part received federal financial assistance." *Stegall v. Colvin*, 2016 U.S. Dist. LEXIS 96440 (N.D. Ill. 2016) at 9. A plaintiff can also use either the direct or indirect method of proving discrimination under the Rehabilitation Act. *Id.* An individual who is not a "qualified individual" under the ADA is also not a "qualified individual" under the Rehabilitation Act. The Rehabilitation Act protects "a 'qualified individual with a disability' from discrimination 'solely by reason of' her disability in any program receiving federal assistance." *Felix v. Wis. DOT*, 828 F.3d 560, 568 (7th Cir. 2016). Because the "qualified individual" requirement was imported in the Rehabilitation Act, the "direct threat" qualifier to "qualified individual" also applies under the Rehabilitation Act. *Id.* at 569. "A 'direct threat' is . . . defined by regulation to 'mean a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.'" *Id*. However, because the Rehabilitation Act requires that the adverse employment actions be taken "'solely by reason of'" the disability, the Rehabilitation Act is an even higher bar for a plaintiff to meet than a claim under the ADA. *Id.* at 568.

Because McLane's Rehabilitation Act claim is identical to that of his ADA claim,

McLane's Rehabilitation Act claim fails as well for the same reasons as set forth regarding the ADA. McLane was not qualified to perform the essential functions of his job, he could not perform his job duties even with accommodation, he was a direct threat to himself, and he cannot identify any similarly situated employees as argued above. Further, School City had a legitimate, nondiscriminatory reason to transfer McLane to a hall monitor position; McLane could not safely perform the essential functions of his job. As a result, McLane's Rehabilitation Act claim fails.

School City next seeks summary judgment with respect to McLane's Age Discrimination in Employment Act claim. It is unlawful for an employer to "refuse to hire or otherwise discriminate against an individual because of such individual's age." *Roberts v. Columbia College Chicago*, 821 F.3d 855, 865 (7th Cir. 2016). Plaintiffs may use either the direct or indirect method of proof to prove a case under the Age Discrimination in Employment Act.

Under the direct method of proof, a plaintiff must either present a direct admission from his employer "that he was fired for age discriminatory reasons, or show a 'convincing mosaic' of circumstantial evidence that 'points directly to a discriminatory reason for [his employer's] action.'" *Id.*

Under the ADEA, Plaintiffs may argue that statements made disparagingly about age prove that there is a "convincing mosaic" of circumstantial evidence of animus. However, even actual animus displayed by a nondecisionmaker is not evidence that "the employer's actions were on account of the plaintiff's age." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012). Even if a decision maker makes discriminatory remarks, to be actionable under the direct method, the discriminatory remarks must be "contemporaneous with the discharge or

causally related to the discharge decision-making process." *Id*. at 605. "To raise an inference of discrimination, comments must be '(1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action.'" *Teruggi v. CIT Group/Capital Fin., Inc*., 709 F.3d 654, 661 (7th Cir. 2013).

School City argues that McLane has no evidence pointing to a direct admission by anyone at School City that he was fired for an age discriminatory reason, leaving McLane only the "convincing mosaic" argument. McLane has no evidence to support that option under the direct method. McLane claims that he was discriminated against on the basis of his age because Charles Trippel made a statement to Rose Mead, another employee at School City, that he felt people should retire when they get to retirement age. (See Plaintiff's Response to Defendant's First Set of Interrogatories, No. 18). The statement allegedly made by Trippel, which Trippel denies, did not directly mention McLane in any way nor is there any evidence that the alleged statement was made in any context related to McLane. (See Trippel Dep. 26:13-16). McLane learned of the alleged statement through a discussion he had with Rose Mead in February or March 2014, meaning that any alleged statement by Trippel, if it was made at all, would have to been made prior to that time. (See McLane Dep. 81:3-7).

First and foremost, the alleged statement was not made contemporaneously with McLane's transfer to a hall monitor position nor was it causally related to the decision making process. Further, to create an inference of discrimination, any such comment would have to been made by a decision maker. Both Trippel and Hixenbaugh confirmed in their depositions that Trippel was not a decision maker regarding the fit for duty exam, the leave of absence, or the decision to transfer McLane to a hall monitor position. In addition, any comments were made at

least two months, if not more, before McLane was transferred to a hall monitor position. Accordingly, the alleged remarks do not raise the inference of discrimination which McLane needs to prove his claim.

McLane also asserts that Trippel told McLane in April of 2014 that he wanted McLane to retire. Trippel denies that any such comment was made. (See Trippel Dep. 26:24-27:2). As established above, Trippel was not a decision maker with respect to McLane's transfer to a hall monitor position. Further, the decision to transfer McLane was not made until June of 2014 some two months after the alleged comment would have been made. Finally, the alleged comment was not in any way related to the transfer of McLane to a hall monitor position. The alleged comment implies that McLane should stop working. School City did not take any action to make McLane stop working. To the contrary, School City recognized that McLane could not safely perform the essential functions of the groundskeeper position and took steps to continue McLane's employment with School City by transferring him to a hall monitor position. Such an action does not support the position that McLane should retire; rather the action continues McLane's employment. As a result, no inference of discrimination can be drawn from the alleged comment.

If a plaintiff uses the indirect method to prove an age discrimination claim, the plaintiff must show that "(1) he was forty years of age or older; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) a similarly situated, substantially younger employee received more favorable treatment." *Lauth v. Covance, Inc.*, 155 F.Supp.3d 855, 876 (S.D. Ind. 2016).

McLane has no evidence that similarly situated, younger employees received more favorable treatment than him. Like claims under the ADA, a "similarly situated employee" must

be comparable in all material respects in performance, qualifications, and conduct. Id. This comparison "includes showing that the coworkers engaged in comparable rule or policy violations." *Naik v. Boehringer Ingelheim Pharms.*, 627 F.3d 596, 600 (7th Cir. 2010).

McLane has only made bold, unsupported assertions that he was replaced by younger employees. As an example, McLane claims that younger employees replaced him in the summer because he saw them performing his work. School City routinely hires additional help in the summer. Those who were hired immediately after McLane's transfer to a hall monitor position were not hired to do McLane's job although they may have worked in some of the same areas he did. They were simply routine summer help. (See Trippel Dep. 59:1-22). In fact, McLane's position was essentially eliminated after his transfer with his duties spilt among existing employees. No one was hired to replace McLane, let alone a younger employee. (See Trippel Dep. 58:20-23, 60:1-8). As a result, McLane is unable to prove his prima facie case.

McLane's response brief makes no arguments against School City's assertions that it did not discriminate against McLane on the basis of age. McLane fails to address the claim in the argument section of his response and simply mentions, with little to no support, that a younger employee, Cody Stillson, was hired to replace McLane. McLane's support for such allegations is based on McLane's own, self-serving statements and a spreadsheet produced by School City that simply lists the names of various custodians and groundskeepers for School City, their dates of hire, and related positions.

McLane's deposition testimony, however, only shows that McLane saw Stillson doing the type of work that he did. McLane did not know what type of position Stillson held with School City, let alone whether or not Stillson was actually employed in McLane's old position.

(McLane Dep. 73:4-74:20).

McLane's unsupported statements do not provide any evidence that Stillson replaced him. To the contrary, the evidence available shows that no one was hired to replace McLane. (See, Defendant, School City of Mishawaka's, Answers to Plaintiff's First Interrogatories, No. 7, stating that no one was hired or transferred to replace McLane). McLane's supervisor, Charles Trippel, testified in his deposition that McLane's duties were split among existing employees.

> Q: Who did Mr. Mclane's work after he took a leave of absence? I mean, he was doing all the work at Baker Park. Who started doing the work at Baker Park?
> A: It was split up. I can't tell you—
> Q: Among existing employees?
> A: Among existing employees. There was no one hired. (Trippel Dep. 60:1-8).

Trippel addressed the Stillson replacement issue directly in his deposition when he stated that Stillson was not hired to replace McLane. (Trippel Dep. 62:11-12, 69:13-70:1). McLane has provided no evidence to show that he was replaced by a younger employee as required for him to prove his claim under the ADEA.

McLane's only other support for his age discrimination claim is that Trippel asked McLane if he was thinking of retiring. As discussed above, any such references are not sufficient to prove age discrimination. First and foremost, School City has provided evidence through the depositions of Trippel and Gregg Hixenbaugh, School City's former Director of Human Resources, that Trippel did not make the decision to transfer or terminate McLane. McLane has not designated any evidence to refute that fact. As such, any references to retirement are not proof of age discrimination. In addition, the actions of School City do not show that it wished for McLane to retire. Rather, School City requested that McLane transfer to a hall monitor position,

not because of his age, but, as established by the Job Site Analysis, because McLane could not safely perform the essential functions of the groundskeeper position.  The undisputed facts show that School City's decision was not base on pretext or the result of discriminatory action, but was made in an effort to protect McLane from injury.

Accordingly, for all the foregoing reasons, School City's motion for summary judgment will be granted in its entirety.

Conclusion

On the basis of the foregoing, School City's motion for summary judgment [DE25] is hereby GRANTED.


 Entered: February 1, 2017.


                                             s/ William C.  Lee
                                             William C. Lee, Judge
                                             United States District Court